**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3094

THIS DOCUMENT RELATES TO ALL CASES

JUDGE KAREN SPENCER MARSTON |
| CANDACE MCGLOTHIN,
        *Plaintiff,*

v.

ELI LILLY AND COMPANY
        *Defendants.* | COMPLAINT AND JURY DEMAND

CIVIL ACTION NO.: 2:25-cv-4365 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

------------------------------------------------------------------------------------------------------------------

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court.  Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Northern District of Texas as Plaintiff's designated venue ("Original Venue").  Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X Plaintiff currently resides in Ennis, Texas (City/State).

X Plaintiff purchased and used Defendant(s)' products in Ennis, Texas (City/State).

__ The Original Venue is a judicial district in which Defendant _____ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)):  _Northern District of Texas_____.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): _____.

## NATURE OF THE CASE

1.    This is an action for damages suffered by Plaintiff, CANDACE MCGLOTHIN, who was severely injured as a result of Plaintiff's use of Trulicity, an injectable prescription medication that is used to control blood sugar and to reduce cardiovascular risk in adults with type 2 diabetes.

2.    Trulicity is also known as dulaglutide.

3.    Trulicity belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

4.    Defendants acknowledge that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[1] However, Defendants have downplayed the nature, duration, extent, and seriousness of gastrointestinal events and failed to warn about other adverse events caused by their GLP-1RAs. Defendants have never provided adequate warnings about the risks of, among other things, gallbladder injury, all other injuries mentioned in this Complaint, and their sequelae.

5.    The decision to target the American population for the sale of Defendants' GLP-1RAs was not accidental. Defendant understood the vast financial potential of marketing medications for weight loss in the United States, where obesity rates were on the rise despite the culture's obsession with losing weight and being thin.

6.    Defendant set on a course to create and expand the market for weight-loss medication(s) by, among other things, advocating for obesity to be classified as a disease and thereby expanding the market for their drugs, spending hundreds of millions of dollars in an effort to change the medical consensus on how to treat obesity, implementing cutting-edge invasive, unprecedented and multifaceted marketing campaigns that were so effective they engrained these

---

[1] *See, e.g.*, C.T. Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, ROLLING STONE (Jul. 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601.

drugs in the pop culture zeitgeist, and spending untold millions in an effort to get weight-loss medications covered under public and private insurance. Defendant engaged in this conduct even before GLP-1 RAs were approved for weight loss, encouraging extensive off-label demand for, and use of, GLP-1 RAs.

7.     By undertaking that effort, Defendant also were systematically and intentionally targeting users of other diabetes medications. Defendants' promise of weight loss wrongfully enticed users of other diabetes medications to switch to a GLP-1 RA who never would have done so had it not been for the off-label promotion of those drugs.

8.     Defendants also sought to make the GLP-1 RAs more accessible by, among other things, marketing through telemedicine where the criteria for qualifying for the drugs, *e.g.*, Body Mass Index ("BMI"), are more easily manipulated.

9.     Defendants' efforts to conceal (or minimize) the risks associated with taking their drugs were intended to create the impression that these were "miracle drugs" to help users lose weight. However, Defendants never disclosed that many people who take these drugs stop taking them because of the drastic side effects (thereby never achieving weight loss or any health benefit allegedly associated with the drug); the drugs do not result in meaningful weight loss for up to 15% of people;[2] the average weight loss for someone taking the drugs is a modest 10.09% of the person's body weight;[3] and that a person will need to stay on these drugs for the rest of their lives to maintain the weight loss.[4] What is worse, Defendants kept this information hidden while

---

[2] Erica Carbajal, *Up to 15% of patients on weight loss drugs may be 'non-responders'*, BECKER'S HOSPITAL REV. (Apr. 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-weight-loss-drugs-non-responders.html.
[3] Gao, et al., *Efficacy and safety of semaglutide on weight loss in obese or overweight patients without diabetes: A systematic review and meta-analysis of randomized controlled trials*, FRONTIERS IN PHARMACOLOGY 1 (2022).
[4] Wilding, et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24 DIABETES OBES METAB. 1553, 1562 ("[T]reatment withdrawal led to most of the weight loss being regained within 1 year, …, reinforcing the need for continued treatment to maintain weight loss ….").

actively degrading trust in the prevailing view that lifestyle changes like proper nutrition and exercise were the keys to health and can accomplish long-lasting weight loss and management for most people.

10.    The efforts to engrain GLP-1 RAs such as Trulicity in the public conscious, to manipulate the medical community's views on obesity treatment, and to make the drugs more accessible acted as a launching pad for the explosive growth of the GLP-1 RAs both for people with diabetes, and for people seeking to lose weight, whether they were using the drug as prescribed or off-label. Plaintiff would not have taken GLP-1 RAs if they had been provided a full and clear warning of the true risks of taking these drugs.

11.    Defendants' efforts to expand and grow the market both for treatment of diabetes and weight-loss, whether off-label or not, worked. The U.S. GLP-1 RA market is expected to exceed $100 Billion by 2030 with total U.S. users comprising about 9% of the population.[5] This growth is a tremendous boon to Defendants but comes at a significant cost. Financially, it is expected that Defendants' lobbying efforts will pay off, and GLP-1 RAs may get added to prescription drug coverage under Medicare Part D in the coming years. Some analysts project that this will add $13.6 to $26.8 Billion to Medicare Part D expenses even if only 10% of people with obesity use them, causing a significant shift in premiums and coverage in other areas.[6]

12.    The outsized growth of the market for GLP-1 RAs also means that the patient base has expanded to include many patients who would be better served choosing alternate treatment paths. Defendants' marketing campaigns have altered the public understanding of weight loss

---

[5]  J.P. Morgan Research, *The increase in appetite for obesity drugs* (Nov. 29, 2023), available at https://www.jpmorgan.com/insights/global-research/current-events/obesity-drugs#sectionheader#0.
[6] Vanderbilt University Medical Center, *Cost of covering antiobesity drugs could be billions to Medicare despite, a new analysis finds* (Mar. 15, 2023), available at https://www.vumc.org/health-policy/medicare-antiobesity-medications-nejm.

treatment, creating the impression that GLP-1 RAs are not just one tool among many available to doctors, but are instead "miracle drugs." But, these patients, like Plaintiff, were lured into a false sense of hope that GLP-1 RAs would guarantee results and be efficacious and safe. Plaintiff injected themselves with GLP-1 RAs believing that they were doing something to promote their health when, in fact, it had the opposite effect.

13.     As a result of the foregoing, Plaintiff has suffered and was diagnosed with various forms of injury which were directly and proximately caused by their regular and prolonged use of GLP-1 RAs. Plaintiff's injuries include, but are not limited to gallbladder injury and its sequelae, including debilitating nausea, debilitating vomiting, debilitating abdominal pain, debilitating bloating, extreme constipation, and emotional distress, among other injuries.

## **PLAINTIFF**

14.     Plaintiff, CANDACE MCGLOTHIN, is a citizen of the United States, and is a resident of the State of Texas.

15.     Plaintiff is 38 years old.

16.     Plaintiff used Trulicity from February 2022 to June 2023.

17.     Plaintiff's physician(s) ("prescribing physician(s)") prescribed the Trulicity that was used by Plaintiff.

18.     As a result of using Trulicity, Plaintiff was caused to suffer from gallbladder injury and its sequelae and, as a result, sustained severe and debilitating personal injuries, pain, suffering, and emotional distress, and incurred medical expenses.

19.     As a result of using Victoza, Plaintiff was caused to suffer from gallbladder injury and its sequelae, which resulted in, for example, gallbladder surgery, severe nausea, vomiting, abdominal pain, bloating, constipation and hospitalization.

## DEFENDANTS

20.     Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with a principal place of business at 893 S. Delaware St., Indianapolis, Indiana.

21.     Eli Lilly designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed Trulicity and is identified on its label.[7]

22.     Eli Lilly is collectively referred to herein as "Defendant".

## FACTUAL ALLEGATIONS

**A.     Introduction to GLP-1 and GLP-1 RA Products**

23.     Researchers first discovered GLP-1 in hamsters in 1983.[8] It is a hormone that helps regulate blood sugar, appetite, and digestion in animals, including humans; and is produced naturally in the brain and intestinal wall of humans.

24.     In 1993, researchers discovered that a peptide from the venom of gila monsters activated GLP-1 receptors.[9] Gila monsters can go for months without eating but maintain stable blood sugar levels because they make very high levels of a glucagon peptide called exendin-4. Thus, the gila monster served as the inspiration for the GLP-1 RA class of drugs.

25.     Following the discovery that exendin-4 is similar in structure to GLP-1, a synthetic version of exendin-4 was developed to treat diabetes. This became the first GLP-1 drug, known as Byetta, with the active ingredient exenatide, which came to market in 2005. Byetta was initially

---

[7] *See* Trulicity Label (revised Nov. 2022), available at
https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/125469s051lbl.pdf (last visited Nov. 15, 2023).
[8] Bell, et al., *Hamster preproglucagon contains the sequence of glucagon and two related peptides*, 302 NATURE 716 (1983).
[9] Thorens, et al., *Cloning and functional expression of the human islet glp-1 receptor*, 42 DIABETES 1678 (1993).

brought to market as a collaboration between Eli Lilly and Amylin.[10] Whereas naturally-occurring GLP-1 has a short half-life of just a few minutes, Byetta's half-life was noted to be 2.4 hours.[11]

26.     Simultaneously with the development of exenatide, Novo was developing another GLP-1 drug called liraglutide. In the early 1990s, Novo researchers discovered that when they injected liraglutide into rats, it caused them to stop eating almost entirely.[12] Liraglutide came to market in 2010, marketed initially as Victoza and later as Saxenda. Liraglutide has a half-life of 13-15 hours.[13]

27.     Various active ingredients fall within the GLP-1 RA class of drugs, including semaglutide (marketed by Novo as Ozempic, Wegovy, and Rybelsus), liraglutide (marketed by Novo as Saxenda, Victoza, and in combination with insulin as Xultophy 100/3.6), tirzepatide (marketed by Lilly as Mounjaro and Zepbound), dulaglutide (marketed by Lilly as Trulicity), exenatide (marketed by various companies as Byetta, Bydureon, and Bydureon BCise), albiglutide (marketed by GlaxoSmithKline as Tanzeum), and lixisenatide (marketed by Sanofi as Adlyxin and in combination with insulin as Soliqua 100/33). The U.S. Food & Drug Administration ("FDA") recognizes GLP-1 RAs as a class of drugs based on similarities in their mechanisms of action,

---

[10] News Release: Amylin and Lilly Announce FDA Approval of BYETTA(TM) (Exenatide Injection) (Apr. 29, 2005), *available at* https://investor.lilly.com/news-releases/news-releasedetails/amylin-and-lilly-announce-fda-approval-byettatm-exenatide (last visited Nov. 8, 2023) (describing the drug as a "collaboration" between Amylin and Lilly).
[11] Cai, et al., *Long-acting preparations of exenatide,* DRUG DES. DEVEL. THER. (Sept. 2013).
[12] Gina Kolata, *We Know Where New Weight Loss Drugs Came From, but Not Why They Work,* NEW YORK TIMES (Aug. 17, 2023), available at https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html.
[13] Rubino, et al., *Effect of Weekly Subcutaneous Semaglutide vs Daily Liraglutide on Body Weight in Adults with Overweight or Obesity without Diabetes: The STEP 8 Randomized Clinical Trial,* JAMA (Jan. 2022).

physiologic effects, and chemical structure.[14] Defendants likewise recognize that their GLP-1 RAs are members of the same class.[15]

28.     Medications within the GLP-1 RA class of drugs mimic the activities of physiologic GLP-1 in numerous ways,[16] including attaching to GLP-1 receptors, sending various signals in the body, triggering a sensation of satiety (or perception of fullness, thereby curbing users' appetites and decreasing intake of calories and nutrients),[17] acting on the pancreas to stimulate the release of insulin, suppressing the release of glucagon, and slowing or inhibiting gastric emptying and intestinal motility.[18]

29.     In contrast to naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes, GLP-1 RAs are engineered to last longer, as previously noted. The chemical structure of GLP-1 RAs includes a fatty chain that inhibits such quick dissolution. GLP-1 RAs such as semaglutide have a long half-life of well over 100 hours, causing the drugs to stay in the body for a month or more after the last dose.

---

[14]     *See* FDA Ozempic Summary Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209637Orig1s000SumR.pdf at 8 (including liraglutide, dulaglutide, and semaglutide in the GLP-1 RA class) (last visited Jan. 2, 2025); *see also* FDA Mounjaro Clinical Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000MedR.pdf at 52 (results of tirzepatide toxicology studies in animals were typical of the GLP-1 RA pharmacologic class) (last visited Jan. 2, 2025); *see also* https://www.fda.gov/industry/structuredproductlabeling-resources/pharmacologic-class (last visited Dec. 28, 2023).

[15]     SURMOUNT-1 Clinical Trial Protocol at 45, available at https://cdn.clinicaltrials.gov/largedocs/22/NCT04184622/Prot_000.pdf ("General safety characteristics of all studied doses of tirzepatide were similar to those of the GLP-1R agonist class…"); STEP-1 Clinical Trial Protocol at 15, accessible at https://cdn.clinicaltrials.gov/large-docs/35/NCT03548935/Prot_002.pdf ("[T]he tolerability and safety profile [of semaglutide] was overall consistent with… the GLP-1 RA class in general.").

[16]     Cleveland Clinic, *GLP-1 Agonists* (Jul. 3, 2023), available at https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.

[17]     *See* Bloemendaal, et al., *Effects of glucagon-like peptide 1 on appetite and body weight: focus on the CNS,* J. ENDOCRINOLOGY (Apr. 2014).

[18]     Deane, et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia,* 95(1) J. CLINICAL ENDO. METAB., 225-221 (January 1, 2010), available at https://academic.oup.com/jcem/article/95/1/215/2835243; American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (Jun. 29, 2023), available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-takingpopular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery.

30.     Most GLP-1 RAs are approved to treat type 2 diabetes,[19] but some (Wegovy, Saxenda, and Zepbound) are approved to treat obesity or to reduce cardiovascular risks.

31.     Most GLP-1 RAs are administered by injection, with the exception of Rybelsus, which is in tablet form.[20]

32.     Most of the GLP-1 RAs at issue in this case are weekly injectable drugs, except that liraglutide (the active ingredient in Saxenda and Victoza) is a daily injectable drug.[21]

33.     Most GLP-1 RAs are dosed between 0.25 and 2 milligrams per week, except that the maximum dose for Wegovy is 2.4 milligrams per week, and the maximum dose for Mounjaro is 15 milligrams per week.

34.     Because the risks associated with GLP-1 RAs are common to the entire class of drugs, any evidence regarding the association between NAION and its sequelae and *any* GLP-1 RA (such as tirzepatide, exenatide, liraglutide, albiglutide, dulaglutide, lixisenatide, and semaglutide) should have put Defendants on notice of the need to warn patients and prescribing physicians of the risk of NAION and its sequelae associated with these drugs.

**B.     Introduction to Plaintiff's Injuries: Gallbladder Disease and its Sequelae**

35.     GLP-1 RAs can cause a myriad of injuries including developing gallbladder disease and its sequelae.

36.     These injuries can be debilitating and go so far as to result in death. The FDA's adverse events database lists nearly 500 deaths related to semaglutide (Novo's GLP-1 RA) in the

---

[19] Unlike patients with type 1 diabetes, who cannot produce insulin, patients with type 2 diabetes cannot use insulin properly. *Compare* Cleveland Clinic, *Type 1 Diabetes* (Mar. 9, 2022), available at https://my.clevelandclinic.org/health/diseases/21500-type-1-diabetes, *with* Cleveland Clinic, *Type 2 Diabetes* (Nov. 8, 2023), available at https://my.clevelandclinic.org/health/diseases/21501-type-2-diabetes.
[20]     Cleveland Clinic, *GLP-1 Agonists* (Jul. 3, 2023), available at https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.
[21] *Id.*

United States.[22] Recent reports indicate that a British nurse, Susan McGowan, aged 58, passed away from "multiple organ failure, septic shock … pancreatitis … and "the use of prescribed tirzepatide" (Lilly's GLP-1 RA).[23] In the United Kingdom, there have been at least 23 deaths linked to semaglutide since 2019.[24]

37.    GLP-1 RAs pose a significant risk of biliary disease (diseases of the bile tract); specifically, gallbladder-related complications, including cholelithiasis (gallstones), cholecystitis (inflammation of the gallbladder), and the need for cholecystectomy (gallbladder removal surgery).[25]

38.    Cholelithiasis, commonly referred to as gallstones, involves the formation of solid particles within the gallbladder due to the crystallization of bile. GLP-1 RA have been shown to impair gallbladder motility, leading to bile stasis, where bile is not expelled efficiently from the gallbladder. This stasis promotes the development of gallstones. Patients using these drugs are at a higher risk of developing gallstones, which can cause significant pain and lead to further complications, such as cholecystitis or infection.[26]

39.    Cholecystitis, the inflammation of the gallbladder, typically arises from gallstones obstructing the bile ducts. This condition can lead to debilitating abdominal pain, fever, infection,

---

[22] Meg Tirrell, *Compounded semaglutide associated with at least 10 deaths, Novo Nordisk CEO warns*, CNN (Nov. 10, 2024), available at https://www.cnn.com/2024/11/06/health/compounded-semaglutide-deaths-novo-nordisk-ceo/index.html.
[23] C. MacPhee and J. Cheyne, *Nurse's death linked to approved weight-loss drug*, BBC (Nov. 7, 2024), available at https://www.bbc.com/news/articles/cz6jg6nw2zeo.
[24] *Id.*
[25] Faillie, et al., *Association of Bile Duct and Gallbladder Diseases with the Use of Incretin-Based Drugs in Patients with Type 2 Diabetes Mellitus*, 176 JAMA INTERNAL MED. 1474 at 12 (2016).
[26] He, et al., *Association of Glucagon-Like Peptide-1 Receptor Agonist Use with Risk of Gallbladder and Biliary Diseases: A Systematic Review and Meta-analysis of Randomized Clinical Trials*, 182 JAMA INTERNAL MED. 513 at 2 (2022); Yang, et al., *Weight Reduction and the Risk of Gallbladder and Biliary Disease: A Systematic Review and Meta-analysis of Randomized Clinical Trials*, 25 OBESITY REV. e13725 at 8 (2024).

and other complications.[27] Cholecystitis often requires urgent medical intervention, including cholecystectomy (gallbladder removal surgery), to prevent further, dangerous complications.

40.     Biliary sludge, a mixture of microscopic particles suspended in bile, can accumulate in the gallbladder and is often a precursor to more serious conditions such as gallstones or biliary obstruction. The impaired gallbladder motility caused by GLP-1 RAs can contribute to the buildup of biliary sludge.[28] This sludge can lead to inflammation and, if untreated, may cause significant damage to the biliary system, ultimately increasing the risk of gallbladder removal surgery.[29]

41.     Biliary obstruction occurs when the bile ducts become blocked, preventing the flow of bile from the liver to the intestines. This condition is often caused by gallstones or biliary sludge obstructing the ducts, leading to debilitating pain, jaundice, and infection. GLP-1 RAs have been associated with an increased risk of biliary obstruction: clinical studies report a higher incidence of biliary-related complications in patients using these drugs.[30] Biliary obstruction can lead to debilitating complications, including the need for medical intervention to restore bile flow. Studies have demonstrated that GLP-1 receptor agonists are associated with an increased risk of biliary and gallbladder diseases, which may require surgical procedures such as cholecystectomy in cases where these conditions progress.[31]

---

[27] Nauck, et al., *Effects of Liraglutide Compared with Placebo on Events of Acute Gallbladder or Biliary Disease in Patients with Type 2 Diabetes at High Risk for Cardiovascular Events in the LEADER Randomized Trial*, 42 DIABETES CARE 1912, 1912-13, 1915 (2019).

[28] *Id.* at 1918.

[29] *See id.*

[30] *See generally* He, et al., *Association of Glucagon-Like Peptide-1 Receptor Agonist Use with Risk of Gallbladder and Biliary Diseases: A Systematic Review and Meta-analysis of Randomized Clinical Trials*, 182 JAMA INTERNAL MED. 513, 514-19 (2022).

[31] *Id.*; *see also* Nauck, et al., *Effects of Liraglutide Compared with Placebo on Events of Acute Gallbladder or Biliary Disease in Patients with Type 2 Diabetes at High Risk for Cardiovascular Events in the LEADER Randomized Trial*, 42 DIABETES CARE 1912, 1912 (2019) ("Cholecystectomy was performed more frequently in liraglutide-treated patients (HR 1.56; 95% CI 1.10, 2.20; P = 0.013").

42.     Patients who develop gallbladder or biliary complications as a result of using GLP-1 RAs often require medical or surgical interventions to prevent further damage and restore proper gallbladder or biliary function. These interventions range from non-invasive medical management to surgical procedures, depending on the severity of the condition.

43.     For patients experiencing gallstones (cholelithiasis) or inflammation of the gallbladder (cholecystitis), initial medical interventions may include the use of medications to manage symptoms such as pain and nausea, as well as antibiotics to address any infections. In many cases, however, these medical measures are insufficient to resolve the underlying issue, particularly when gallstones or biliary obstruction occur.

44.     In cases where gallstones cause significant obstruction of the bile ducts, surgical intervention can be necessary.

**C.     FDA's Approval of Trulicity**

45.     On September 18, 2014, the FDA approved Eli Lilly's Biologics License Application ("BLA") for dulaglutide "as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus" to be marketed as Trulicity in "single dose pre-filled syringes and pre-filled pens." As initially approved, the recommended dose for Trulicity was 1.5 mg per week.[32]

46.     On April 19, 2019, Eli Lilly submitted supplemental BLA 125469/S-033, requesting approval to expand its marketing of Trulicity by adding an indication for reduction of major cardiovascular events in adults with type 2 diabetes. On February 21, 2020, the FDA approved the request.[33]

---

[32] FDA Approval Letter for BLA 125469/0 (Sept. 18, 2014), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2014/125469Orig1s000ltr.pdf (last visited Nov. 8, 2023).
[33] FDA Approval Letter for BLA 125469/S-033 (Feb. 21, 2020), available at
https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2020/125469Orig1s033ltr.pdf (last visited Nov. 8, 2023).

47.     On November 4, 2019, Eli Lilly submitted BLA 125469/S-036, seeking approval for higher doses (3 mg per week and 4.5 per week) of Trulicity. On September 3, 2020, the FDA approved that request.[34]

48.     On May 17, 2022, Eli Lilly submitted BLA 125469/S-051, seeking to add an indication for a new patient population: "pediatric patients 10 years of age and older with type 2 diabetes mellitus." On November 17, 2022, the FDA approved the drug for pediatric use.[35]

### D.     Eli Lilly's Marketing and Promotion of Trulicity

49.     At all relevant times, Eli Lilly was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Trulicity.

50.     Trulicity has been the top earning product for Eli Lilly for the past several years, with the drug bringing in more than $5.6 billion in revenue in 2022 in the United States alone. The demand for Trulicity is largely driven by Eli Lilly's advertising, which costs the company more than $1 billion annually. Eli Lilly advertises Trulicity through its websites, press releases, in-person presentations, the drug's label, print materials, social media, and other public outlets. Eli Lilly's advertisements tout the health benefits of Trulicity, without warning of the risk of gallbladder injury or its sequelae.[36]

51.     Upon the approval of Trulicity on September 18, 2014, an Eli Lilly spokesperson indicated that Trulicity "has demonstrated proven glycemic control, only has to be taken once

---

[34] *See News Release: FDA approves additional doses of Trulicity (dulaglutide) for the treatment of type 2 diabetes,* Eli Lilly (Sept. 3, 2020) available at https://investor.lilly.com/news-releases/news-release-details/fda-approves-additional-doses-trulicityr-dulaglutide-treatment (last visited Nov.15, 2023).

[35] FDA Approval Letter for BLA 125469/S-051 (Nov. 17, 2022), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/125469Orig1s051ltr.pdf (last visited Nov. 15, 2023).

[36] Eli Lilly and Company 2022 Annual Report, available at https://investor.lilly.com/static-files/2f9b7bb1-f955-448d-baa2-c4343d39ee62 (last visited Nov. 15, 2023).

weekly, and comes in an easy-to-use pen."[37] Although a press release accompanying Trulicity's approval acknowledged that "nausea," "vomiting" abdominal pain" were among the most common adverse reactions reported with use of Trulicity, the press release did not indicate that those common adverse reactions were symptoms of gallbladder injury or warn of the risk of gallbladder injury or its sequelae.

52.     Following the FDA's approval of Trulicity in September 2014, Eli Lilly launched its direct-to-consumer ad campaign in 2015, with print and digital ads first appearing in September 2015 and the first Trulicity television ad launching on October 19, 2015.[38]

53.     On November 5, 2018, in a press release announcing Trulicity's "superiority in reduction of cardiovascular events," as shown by an internal clinical trial, Eli Lilly acknowledged that "[t]he safety profile of Trulicity … was generally consistent with the GLP-1 receptor agonist class." Although the press release included a section titled "Important Safety Information for Trulicity," the press release did not warn that Trulicity can cause gallbladder injury or its sequelae.[39]

54.     In a February 21, 2020, press release announcing Trulicity's new indication for reduction of cardiovascular risk, Eli Lilly touted Trulicity's ability to reduce the risk of major adverse cardiovascular events, including heart attack and stroke, even in adults without established

---

[37] *Lilly's Trulicity (dulaglutide) Now Available in U.S. Pharmacies,* PR Newswire (Nov. 10, 2014), available at https://www.prnewswire.com/news-releases/lillys-trulicity-dulaglutide-now-available-in-us-pharmacies-282138401.html (last visited Nov. 15, 2023).

[38] Beth Snyder Bulik, *One year after FDA nod, Eli Lilly's Trulicity launches first consumer campaign,* Fierce Pharma (Oct. 19, 2015) https://www.fiercepharma.com/dtc-advertising/one-year-after-fda-nod-eli-lilly-s-trulicity-launches-first-consumer-campaign (last visited Nov. 15, 2023).

[39] *News Release: Trulicity (dulaglutide) demonstrates superiority in reduction of cardiovascular events for broad range of people with type 2 diabetes,* Eli Lilly (Nov. 5, 2018), available at https://investor.lilly.com/news-releases/news-release-details/trulicityr-dulaglutide-demonstrates-superiority-reduction (last visited Nov. 15, 2023).

cardiovascular disease.[40] In the press release, Eli Lilly again indicated that "Trulicity's safety profile [is] consistent with the GLP-1 receptor agonist (RA) class," but despite warning of certain risks, the press release did not warn of the risk of gallbladder injury, or its sequelae, associated with GLP-1RAs.

55.     When announcing the approval of higher weekly doses of Trulicity in September 2020, Eli Lilly's press release indicated that "with the 3.0 and 4.5 [mg] doses available, people with type 2 diabetes who use Trulicity can benefit from additional A1C and weight loss as their condition progresses."[41] Despite touting the off-label use of Trulicity for "weight loss," Eli Lilly did not warn of the associated risk of gallbladder injury or its sequelae.

56.     Around this same time, Robert H. Schmerling, MD, Senior Faculty Editor and Editorial Advisory Board Member at Harvard Health Publishing commented that the actors in the television ads for Trulicity appeared notably thinner than the typical person with type 2 diabetes.[42]

57.     In Summer 2021, in conjunction with Eli Lilly's sponsorship of the rescheduled Summer Olympics, Eli Lilly ran extensive television ads for Trulicity featuring Olympic gymnast Laurie Hernandez and her father, who has type 2 diabetes. The ad indicates that treatment with Trulicity is the "right choice" for people with type 2 diabetes but does not mention or warn about gallbladder injury or its sequelae.[43]

---

[40] *News Release: Trulicity (dulaglutide) is the first and only type 2 diabetes medicine approved to reduce cardiovascular events in adults with and without established cardiovascular disease,* Eli Lilly (Feb. 21, 2020), available at https://investor.lilly.com/news-releases/news-release-details/trulicityr-dulaglutide-first-and-only-type-2-diabetes-medicine (last visited Nov. 15, 2023).
[41] *News Release: FDA approves additional doses of Trulicity (dulaglutide) for the treatment of type 2 diabetes,* Eli Lilly (Sept. 3, 2020) available at https://investor.lilly.com/news-releases/news-release-details/fda-approves-additional-doses-trulicityr-dulaglutide-treatment (last visited Nov.15, 2023).
[42] Robert H. Schmerling, MD, *Harvard Health Ad Watch: A feel-good message about a diabetes drug,* Harvard Health Publishing (Sept. 18, 2020), available at https://www.health.harvard.edu/blog/harvard-health-ad-watch-a-feel-good-message-about-a-diabetes-drug-2020091620961 (last visited Nov. 15, 2023).
[43] *See* Trulicity TV advertisement, available at https://www.youtube.com/watch?v=eVA1vYV980w (last visited Nov. 15, 2023); Beth Snyder Bulik, *Lilly warms up for Olympics with Team USA athletes in ads for Trulicity, Emgality and Verzenio,* Fierce Pharma (July 7, 2021), available at https://www.fiercepharma.com/marketing/lilly-warms-up-for-olympics-team-usa-athletes-ads-for-trulicity-emgality-and-verzenio (last visited Nov. 15, 2023).

58.     In a similar January 2022 television ad featuring Olympic figure skater Madison Chock and her mother, Eli Lilly again indicated that Trulicity was the "right choice" for people with type 2 diabetes but did not warn that Trulicity can cause gallbladder injury or its sequelae.[44]

59.     In January 2022, the FDA determined that Eli Lilly's "10,800 Minutes" Instagram ad for Trulicity "ma[de] false or misleading claims and representations about the benefits and risks of Trulicity" and that the ad elicits "a misleading impression regarding the safety and effectiveness of Trulicity" that "minimizes the risks associated with the use of Trulicity." In response to a letter from the FDA, Eli Lilly temporarily removed the Trulicity Instagram account.[45] The FDA citation is emblematic of Eli Lilly's willingness to mislead and omit important information, focusing on profit over safety, specifically with respect to Trulicity.

60.     That same month, it was reported that Trulicity was the most advertised drug on United States television, with Eli Lilly spending an estimated $36.2 million on national television advertisements in January 2022 alone.[46]

61.     In another Trulicity television ad that premiered in February 2022, Eli Lilly boasted that Trulicity "can help you lose up to ten pounds," a use for which Trulicity is not indicated, but did not mention the risk of gallbladder injury or its sequelae.[47]

62.     Similarly, Eli Lilly's promotional website for Trulicity (Trulicity.com) states that people taking Trulicity "lost up to 10 lbs," without disclosing the risk of gallbladder injury.[48]

---

[44] *See* Trulicity TV advertisement (Madison Chock), available at https://www.ispot.tv/ad/q3ii/trulicity-shes-got-this-featuring-madison-chock (last visited Nov. 15, 2023).

[45] Fraiser Kansteiner, *FDA chides Eli Lilly for 2nd misleading ad in 2 months, this time for diabetes blockbuster Trulicity,* Fierce Pharma (Jan. 25, 2022), available at https://www.fiercepharma.com/marketing/fda-chides-lilly-for-second-misleading-ad-2-months-time-for-diabetes-med-trulicity (last visited Nov. 15, 2023).

[46] Ben Adams, *Eli Lilly's Trulicity dethrones Dupixent, taking January's TV ad spending crown,* Fierce Pharma (Feb. 4, 2022), available at https://www.fiercepharma.com/marketing/sanofi-regeneron-s-dupixent-de-throned-as-lilly-s-trulicity-takes-crown-january-s-biggest (last visited Nov. 15, 2023).

[47] Trulicity TV advertisement ("Father-Son"), available at https://www.ispot.tv/ad/q4Kl/trulicity-father-son (last visited Nov. 15, 2023).

[48] *See* https://www.trulicity.com/what-is-trulicity#what-is-trulicity.

63.    By the end of 2022, the market was experiencing shortages of Trulicity due to "high demand" driven by Eli Lilly's advertising.[49]

**E.    Defendant's Continuing Failure to Disclose the Risk of Gallbladder Disease and its Sequelae**

64.    Defendants knew or should have known that GLP-1 RAs posed significant risks of gallbladder-related complications, including cholelithiasis, cholecystitis, and the need for cholecystectomy, but Defendants failed to provide adequate warnings to physicians and patients for years.

65.    Ultimately, the label updates, which came long after these risks had been clearly identified, failed to fully convey the potential for serious and recurring gallbladder-related complications. Instead of providing comprehensive warnings, the labels merely referred to the risk of "Acute Gallbladder Disease," an inadequate description that downplayed the severity and range of conditions that patients faced, including the potential for long-term damage and the need for surgical intervention.

66.    The eventual updates to the labeling for these drugs merely warned about acute gallbladder injury and did not adequately address the potential for severe and debilitating complications. These warnings came too late for many patients. Below are the specific label warnings issued:

- **Ozempic** (March 2022): "Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated."[50]

- **Rybelsus** (June 2022): "Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated."[51]

---

[49] https://www.fiercepharma.com/manufacturing/after-novos-wegovy-supply-woes-lillys-would-be-obesity-rival-tirzepatide-runs-scarce
[50] Ozempic, Novo Nordisk Inc., 2022, "Warnings and Precautions: Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated (5.8)."
[51] Rybelsus, Novo Nordisk Inc., 2022, "Warnings and Precautions: Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated (5.7)."

- **Saxenda** (December 2014): "Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated."[52]

- **Wegovy** (June 2021): "Acute Gallbladder Disease: Has occurred in clinical trials. If cholelithiasis is suspected, gallbladder studies and clinical follow-up are indicated."[53]

67.     The warnings were issued only after continuous yearly increases in the total number of adverse events from 2014 to 2022. The following chart shows data from the FAERS system that details the number of reported adverse events by year for GLP-1 RAs from 2010 to 2024: XXX[54]

68.     Defendants' failure further deprived patients and doctors alike from having the full information necessary to weigh the risks and benefits of taking Defendants' GLP-1 RAs.

69.     At all relevant times, Defendants did not fully inform the FDA about the justification for the warnings set forth above and required by state law.

70.     At all relevant times, Defendants failed to reevaluate and re-assess the risks of gallbladder-related complications in light of newly available information.

71.     At all relevant times, Defendants failed to disclose information regarding the serious risks of gallbladder-related complications with their GLP-1 RA drugs.

72.     Had Defendants affirmatively and specifically presented such safety information regarding the risk of gallbladder-related complications with their GLP-1 RA drugs to the FDA, the FDA would have permitted Defendants to add the risk of gallbladder-related complications to the labels of their GLP-1 RA drugs.

---

[52] Saxenda, Novo Nordisk Inc., 2014, "Warnings and Precautions: Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated (5.3)."
[53] Wegovy, Nov Nordisk Inc., 2021, "Warnings and Precautions: Acute Gallbladder Disease: Has occurred in clinical trials. If cholelithiasis is suspected, gallbladder studies and clinical follow-up are indicated (5.3)."
[54] U.S Food & Drug Admin., *FAERS Public Dashboard*, available at https://www.fda.gov/drugs/fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

73.    This failure to adequately warn patients and healthcare providers has directly contributed to severe and debilitating complications, including unnecessary surgeries, prolonged hospitalizations, and significant physical and emotional suffering.

1.    **The Sponsor of a Drug is Responsible for Ensuring the Safety of Its Drug and for Warning**

74.    The Sponsor of a drug is responsible for the safety of its product.

75.    A drug company is responsible for alerting healthcare providers and patients of risks that are unknown or not well understood.

76.    The Institute of Medicine has stated that FDA's ability to oversee drug safety is limited, especially after approval of a drug.

77.    The Institute of Medicine wrote the following in a report entitled *The Future of Drug Safety: Promoting and Protecting the Health of the Public*: "The drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER (FDA Center for Drug Evaluation and Research) that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement." The Report further stated that "FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion."

78.    The FDA has insufficient resources to monitor the 11,000 drugs on the market.

79.    Manufacturers have access to information about their drugs, especially in the post-approval phase as new risks emerge, that is superior to the access that FDA has.

80.    Uncommon risks, or those that appear as common conditions, develop after long periods of time, or have adverse impacts on special populations, may go undetected in clinical trials.

81.    If a drug company has reason to know the risks of a drug may result in adverse events, even if it develops that knowledge in the post-approval context, that company has a responsibility to investigate those risks and to provide necessary information healthcare providers.

82.    The following FDA standards govern a manufacturer's duty to warn: 21 C.F.R. § 201.57(c)(6): Warnings and precautions: "This section must describe clinically significant adverse reactions . . . the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association of a serious hazard with a drug; a causal relationship need not have been definitely established . . ."

83.    In addition, under 21 C.F.R. § 201.57(c)(6), the Warning and Precaution Section of prescription drug labels must "describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards . . ."

84.    It is a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.

85.    A manufacturer is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.

86.    According to industry guidance on warnings from the FDA in 2011, "The WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of

adverse reactions and other potential safety hazards that are *serious* or are *otherwise clinically significant* because they have implications for prescribing decisions or for patient management."[55]

87.     FDA's Guidance also states, "Adverse reactions that do not meet the definition of a serious adverse reaction, but are otherwise clinically significant because they have implications for prescribing decisions or patient management, should also be included in the WARNINGS AND PRECAUTIONS section."[56]

88.     Upon information and belief, as a result of Defendants' inadequate warnings, the medical community at large, and Plaintiff's prescribing physicians in particular, were not aware that GLP-1 RAs can cause gallbladder disease and its sequelae, nor were they aware that "common adverse reactions" listed on the GLP-1 RAs' labels might be symptoms of more serious conditions, including gallbladder disease.

89.     Upon information and belief, had Defendants adequately warned Plaintiff's prescribing physicians of reasonable evidence of a causal association between GLP-1 RAs and gallbladder disease and its sequelae, then the physicians' prescribing decisions would have changed, either by not prescribing the GLP-1 RAs, or by monitoring Plaintiff's health for symptoms of the conditions listed above, and discontinuing the GLP-1 RA's when such symptoms started.

90.     By reason of the foregoing acts and omissions, Plaintiff was caused to suffer from gallbladder disease and its sequelae, which resulted in severe and debilitating personal injuries,

---

[55] U.S. Dept. of Health & Human Services, Food & Drug Admin., *Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format* (Oct. 2011), at 5, available at https://www.fda.gov/files/drugs/published/Warnings-and-Precautions--Contraindications--and-Boxed-Warning-Sections-of-Labeling-for-Human-Prescription-Drug-and-Biological-Products-%E2%80%94-Content-and-Format.pdf.
[56] *Id.* at 6.

physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences and/or dying.

## 2. Defendants' Marketing of GLP-1 RAs Was Intentionally Deceptive and Misleading and Lacked Fair Balance

91.     Defendants' extensive multifaceted advertising, marketing and promotion of GLP-1 RAs consistently highlighted and overstated the weight loss benefits of taking a GLP-1 RA while failing to disclose the risks identified with those drugs and concealing other information that would be material to Plaintiff and their physician in weighing the risks and benefits of taking a GLP-1 RA.

92.     Defendants did not disclose and/or minimized the risks of developing gallbladder disease and its sequelae.

93.     In addition, Defendants intentionally omitted other facts that they knew to be true from their labels, physician communications, marketing, website, public statements, and other public facing communications. These documents omit facts that include: (1) the average person only loses a small percentage of their body weight while on a GLP-1 RA; (2) GLP-1 RAs are not effective for everyone; (3) patients gain the weight back when they stop taking the GLP-1 RA (*i.e.*, patients have to stay on the drug forever); (4) the weight loss achieved while on a GLP-1 RA is not a healthy weight loss; (5) when a patient regains the weight loss achieved while on a GLP-1 RA, they are typically less healthy than when they began the medication; and (6) many people stop taking a GLP-1 RA relatively quickly because of trouble tolerating the drugs. These facts are critical to the balancing of risks and benefits facing most patients.

### a.     Average Weight Loss is Modest

94.     Studies show that the real number are much lower. Measured across the first 12 weeks of the drug, when most people are on the drug, the numbers are closer to 3.6% to 5.9% of

body weight.[57] On July 8, 2024, a JAMA Internal Medicine article suggested that both Novo and Lilly overstated the weight loss benefits of their drug in advertisements. Over a year's time, those on tirzepatide (Mounjaro/Zepbound) lost an average of 15.3% of their body weight compared to 8.3% for semaglutide (Ozempic/Wegovy) users. Only 18% of those on semaglutide reported a weight loss of at least 15% of their body weight after one year of treatment.[58] More importantly, Novo's claim that their drugs create lasting weight loss are also misleading: their own data shows that only 9.4% of patients on the highest dose available sustain weight loss over a four-year period.[59]

### b. Non-Responders

95.    Some research suggests that patients taking semaglutide (*i.e.*, Ozempic and Wegovy) "found about 14% of patients lost less than 5% of their body weight and one-third lost less than 10%" while a separate trial focused on tirzepatide (Mounjaro and Zepbound) "demonstrated similar results."[60] Notably, the article discussing the research states that "Wegovy and Zepbound have been approved by the FDA for weight loss, while Ozempic and Mounajro have been prescribed for that purpose in an off-label fashion."

### c. Patients Must Remain on the Drug to Sustain Weight Loss

---

[57] *See* https://www.wegovy.com/aboutwegovy/why-wegovy.html for Novo Nordisk and https://zepbound.lilly.com/ for Lilly.

[58] Rodriguez et al., *Semaglutide vs Tirzepatide for Weight Loss in Adults With Overweight or Obesity*, 184(9) JAMA INTERN. MED. 1056–64 (2024), doi:10.1001/jamainternmed.2024.2525, available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2821080.

[59] Novo Nordisk, *Obesity care*, CMD24: Capital Markets Day (Mar. 7, 2024), available at https://www.novonordisk.com/content/dam/nncorp/global/en/investors/irmaterial/cmd/2024/P5-Obesity-Care.pdf.

[60] Carbajal, Erica, *Up to 15% of patients on weight loss drugs may be 'non-responders*, BECKER'S HOSPITAL REV. (April 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

96.     For those who lose weight, they typically need to stay on the drug forever to maintain the weight loss.[61] A Medscape article from March of 2024 explains that when "patients stop taking GLP-1s, they tend to regain most of that weight within a year, studies showed."[62]

97.     Novo has publicly recognized that most individuals will regain all the weight back within five years of stopping Ozempic or Wegovy.[63] A trial published by Novo showed that, after a year, participants had gained back two thirds of the weight lost after they stopped taking semaglutide.[64] Indeed, Novo has acknowledged that some individuals will regain even more weight after stopping Ozempic or Wegovy than they initially lost.[65]

98.     As noted by Novo's Martin Holst Lange: "once the majority of the weight loss is accrued, you don't go back and start to increase in weight *if you stay on the drug*."[66]

99.     Wegovy and Ozempic are often marketed as part of a "metabolic reset"[67] even though studies show that weight will be regained upon cessation and even though it has been widely recognized that GLP-1 RAs do not rewire "your neural networks to really define a new

---

[61] M. Karth, *Is Semaglutide a Miracle Weight-Loss Drug?*, PSYCHOLOGY TODAY (Apr. 1, 2023), available at https://www.psychologytoday.com/ie/blog/the-neuroscience-of-eating-disorders/202303/ozempic-and-wegovy-is-semaglutide-a-miracle-weight.

[62] Julie Stewart, *Help Patients Prevent Weight Gain After Stopping GLP-1s*, MEDSCAPE MED. NEWS (Mar. 18, 2024), available at https://www.medscape.com/viewarticle/help-patients-prevent-weightgain-after-stopping-glp-1s-2024a10004z9?form=fpf.

[63] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[64] Wilding et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24(8) DIABETES OBES METAB. 1553-64 (2022), doi:10.1111/dom.14725, available at https://dom-pubs.onlinelibrary.wiley.com/doi/10.1111/dom.14725.

[65] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[66] K. Kindelan, *New study focuses on what happens if you stay on weight loss drug Wegovy for years*, ABC NEWS (May 20, 2024), available at https://abcnews.go.com/GMA/Wellness/new-study-focuses-stay-weight-loss-drug-wegovy/story?id=110401021 (emphasis added).

[67] Calibrate, *How long does it take to lose weight on Ozempic?* (Jun. 5, 2022), available at https://www.joincalibrate.com/resources/how-long-does-it-take-to-lose-weight-on-ozempic.

body weight setpoint."[68] Not only is it not a "reset," but some patients will actually regain even more weight after stopping the drug.[69]

100.    This was consistent with Lilly's sponsored SURMOUNT-4 study of tirzepatide, which showed that patients regained 14% of their body weight after switching from tirzepatide to a placebo.[70] On average, patients were able to maintain only about 10% of the weight they lost from the time they started taking tirzepatide.[71] Notably, the trend towards weigh regain was on clear upward trajectory at the study endpoint, suggesting patients who had ceased taking the drug would continue to regain weight over time.

101.    A meta-analysis of GLP-1 RA clinical trials found that "several GLP-1 RAs showed a gradual decline in effects on body weight throughout the long term intervention. In comparison to placebo, semaglutide resulted in a reduction of body weight from a mean difference of −3.28 kg (95% confidence interval −4.20 to −2.37) with medium term intervention to −2.75 kg (−4.60 to −0.89) with long term intervention. Liraglutide and dulaglutide also showed a similar trend."[72]

### d.    Not a Healthy Weight Loss

102.    Taking GLP-1s may actually result in patients being less healthy. Defendants fully understand that overall health is more than a number, whether that number is purely weight or BMI. Despite this, the focus of prescribing GLP-1 RAs for obesity is on a person's BMI and to the

---

[68] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.
[69] *Id.*
[70] Arone et al., *Continued Treatment With Tirzepatide for Maintenance of Weight Reduction in Adults With Obesity: the SURMOUNT-4 Randomized Clinical Trial*, 331 JAMA 38 (2023).
[71] *Id.* at 45.
[72] Yao et al., *Comparative effectiveness of GLP-1 receptor agonists on glycaemic control, body weight, and lipid profile for type 2 diabetes: systematic review and network meta-analysis*, BMJ OPEN 8 (2023).

extent that BMI is less than 30, whether they also have a weight-related health condition (*i.e.*, cardiovascular disease, etc.).

103.    As previously noted, BMI is a simple calculation that includes only weight and height. This poses limitations for its usefulness on an individual basis, rather than a population basis. For example, Jalen Hurts, Quarterback of the Philadelphia Eagles, is 6 feet and 1 inch tall and weighs 223 pounds, putting his BMI at 29.4 and making him extremely overweight and borderline obese if considering BMI alone. However, this does not account for the fact that he is an elite athlete with a body fat percentage under 10 percent. Nonetheless, if he suffers additional health condition or gains 5 pounds (or simply says he weighs 5 pounds more during a telehealth visit), he would qualify for one of the Defendants' weight loss drugs.

104.    Because of these obvious limitations of BMI, the AMA has urged doctors to deemphasize their use of BMI in determining healthy weights for patients.[73] On June 14, 2023, the AMA adopted a new policy clarifying how BMI should be used as a measure in medicine.[74] The AMA suggests that BMI be used in conjunction with other valid measures of risk such as, but not limited to, measurements of visceral fat, body adiposity index, body composition, relative fat mass, waist circumference and genetic/metabolic factors.[75]

105.    Weight loss as the sole indicator of health has also been rejected by many clinicians in favor of improvements in other health outcomes and the assess the whole health of an individual.[76] These clinicians have cautioned that "a lower body weight does not always mean a

---

[73] *Id.*

[74] AMA, *AMA adopts new policy clarifying role of BMI as a measure in medicine* (Jun. 14, 2023), available at https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policy-clarifying-role-bmi-measure-medicine.

[75] *Id.*

[76] Hagan & Nelson, *Are Current Guidelines Perpetuating Weight Stigma? A Weight-Skeptical Approach to the Care of Patients with Obesity*, 38(3) J. GEN. INTERN. MED. 793–8 (Sept. 2022), available at https://link.springer.com/content/pdf/10.1007/s11606-022-07821-w.pdf?pdf=button; *Why body mass index doesn't*

person is healthier."[77] In many instances, when someone loses weight, they lose fat (a good result), but also lose muscle mass (bad).

106.    It is recognized in the medical community that weight loss achieved by Ozempic and Wegovy is often a result of a significant loss of muscle mass.[78] As a result, individuals may be lighter than they were initially but have a higher percentage of body fat.[79]

107.    To further exacerbate the problem, if patients stop taking a GLP-1 RA and regain weight, as discussed above, that weight gain is typically not adding muscle but instead adding fat. Therefore, the resulting "new you" is less healthy—weighing the same but having a higher percentage of body fat.

108.    The loss of too much muscle mass can lead to sarcopenia, a condition called being "skinny fat," in which the patient has decreased muscle mass, lessened bone density, and lower resting metabolic rate—all of which results in a loss of strength and functionality.[80]

109.    Lilly recognizes that much of the weight loss is actually healthy muscle tissue, but rather than warn consumers that most of the weight loss on tirzepatide will be muscle loss, Lilly has instead invested in developing combination drugs to combat the muscle loss.[81]

110.    Defendants did not warn about the dangers of the type of unhealthy weight loss occurring with GLP-1 RAs. Novo personnel refer to weight loss resulting from Wegovy as a

---

*give the whole health picture*, UW Medicine Newsroom (Jun. 20, 2023), available at https://newsroom.uw.edu/video-library/why-body-mass-index-doesnt-give-the-whole-health-picture.

[77] C. Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), available at https://www.healthline.com/health-news/ozempic-muscle-mass-loss.

[78] K. Sullivan, *Weight loss drugs can lead to muscle loss, too. Is that a bad thing?*, NBC News (May 20, 2023), available at https://www.nbcnews.com/health/health-news/weight-loss-drugs-muscle-loss-rcna84936.

[79] J. Margo, *The alarming twist when using Ozempic for weight loss*, THE AUSTRALIAN FINANCIAL REVIEW (Jul. 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.

[80] C. Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), available at https://www.healthline.com/health-news/ozempic-muscle-mass-loss.

[81] Dani Blum, *The Race Is On to Stop Ozempic Muscle Loss*, NEW YORK TIMES (Feb. 8, 2024), available at https://www.nytimes.com/2024/02/08/well/live/ozempic-muscle-loss-exercise.html.

"healthy" weight loss.[82] At the same time, Novo told investors: "Healthy weight loss is, I don't want to call it the next frontier. But it is certainly important … There is a risk if you do introduce very fast and dramatic weight loss you will lose almost 50-50 lean body mass and fat mass. So the tempered but consistent body weight loss could potentially be healthier than a very dramatic fast weight loss."[83] Novo also stated that reasonable preservation of lean body mass "has to be a focus area, and you will probably see [it] in our pipeline."[84]

111.    Similarly for Lilly, it was a "big investor question around [the] muscle issue"[85] and Lilly knew that "the quality of weight loss" mattered.[86] Lilly recognized that there could be some patients who "could benefit from both weight loss and maybe more muscle," hence why Lilly was investing in further research on products that would prevent muscle loss.[87]

112.    Because Defendants do not warn of or disclose the type of weight loss occurring with GLP-1 RAs, patients do not factor that into their analysis of risks and benefits when considering taking a GLP-1 RA and are not aware that they should take specific steps to mitigate this muscle loss, like dietary changes and strength training.[88]

**e.    Many Patients Do Not Stay on the Drugs Long Enough to See Benefits**

113.    Approximately 58% of patients stop taking a GLP-1 RA within 12 weeks, and 30 percent stop in the first 4 weeks. In May of 2024, Blue Cross Blue Shield published "Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management" noting these

---

[82] A. Pawlowski, *Is it safe to take the anti-obesity drug Wegovy long-term? Doctors weigh in*, TODAY (Jan. 25, 2023), available at https://www.today.com/health/diet-fitness/is-wegovy-safe-for-weight-loss-rcna67277.
[83] *See* 2022-11-03 Q3 Earnings Call.
[84] *Id.*
[85] 20231128 Evercore ISI 6th Annual HealthCONx Conference.
[86] 2024430 Q1 2024 Earnings Call.
[87] 20231128 Evercore ISI 6th Annual HealthCONx Conference.
[88] J. Margo, *The alarming twist when using Ozempic for weight loss*, THE AUSTRALIAN FINANCIAL REVIEW (Jul. 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.

statistics.[89] This means that "[the] value [GLP-1 RA treatment] is not likely to be realized" in most patients.[90]

114.    This is perhaps caused by the fact that side effects are most likely to present themselves in the first 12 weeks of use as the dosage increases. Lilly itself has noted that the risks of the medicine are often seen within just 12 weeks of use as patients are escalating the dosage up.[91] Physicians also recognize that adverse events are also more likely to occur during dose escalation with Ozempic and Wegovy.[92]

115.    Neither Novo or Lilly warns or highlights that most people are unable to tolerate the drug and stay on it long enough for it to make a meaningful difference. These are clear indications that could impact a patient's decision to take a GLP-1 RA.

116.    Federal regulators have raised misleading promotional, marketing and advertising materials with Novo and Lilly (the OPDP's March 14, 2008 letter was previously discussed):

117.    On September 23, 2021, Health and Human Services ("HHS") issued a response letter to Novo regarding Wegovy's misleading statements and that fact that it was minimizing the risk of nausea.[93]

118.    In a June 1, 2015 letter to Lilly related to a proposed print advertisement, the OPDP remarked that Lilly "downplays the risk of nausea experienced in clinical trials."

---

[89] Blue Health Intelligence, *Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management*, Issue Brief (May 2024), available at
https://www.bcbs.com/media/pdf/BHI_Issue_Brief_GLP1_Trends.pdf.
[90] Gleason et al., *Real-world persistence and adherence to glucagon-like peptide-1 receptor agonists among obese commercially insured adults without diabetes*, 30 JMCP 2 (2024).
[91] D. Ovalle et al., *Patients grapple with side effects of popular weight-loss drugs*, THE WASHINGTON POST (Aug. 8, 2023), available at https://www.washingtonpost.com/health/2023/08/08/weight-loss-drugs-side-effects-wegovy-ozempic/.
[92] Braxton Medical Clinic, *Understanding the Side Effects of Semaglutide and Tirzepatide* (Jun. 2, 2024), available at https://www.braxtonmedicalclinic.com/post/understanding-the-side-effects-of-semaglutide-and-tirzepatide-a-comprehensive-guide-for-patients-of-.
[93] OPDP Letter, Sept. 23, 2021 (Novo_GLP_MDL_WEG_NDA_000531088).

119.    In the same 2015 letter, the OPDP said that the promotional materials "misleadingly" implied that Trulicity was indicated for weight-loss and that patients would see substantial loss in weight. While these promotional materials did contain some language in small print that Trulicity was "not indicated for weight loss," the OPDP found that the inclusion of such disclosures did not "mitigate the overwhelmingly powerful weight loss claims and presentations conveyed in the proposed detailed aid."

120.    A mere 3 months later, on September 16, 2014, the FDA wrote again, finding many significant issues related to Trulicity marketing. In addition to repeated comments about minimization of risk and overstatement of efficacy, this time the OPDP noted that Lilly's marketing materials were broadening the patient population for Trulicity. Indeed, the OPDP wrote that Lilly's marketing was "misleading because they suggest that Trulicity is useful in a broader range of patients or conditions than has been demonstrated by substantial evidence." In a January 30, 2018 letter to Lilly, the OPDP repeated its concerns about the "Net impression" of the Trulicity marketing, specifically regarding the prominence and readability of the small print text in the ads, and referring to letters from 2015, 2016 and 2017 as to this point.

121.    A February 12, 2019 letter from OPDP to Lilly repeated the concern about the small print text at the bottom of the commercials.

122.    In a December 17, 2020 letter to Lilly, the OPDP found that Lilly was creating a "misleading impression" that Trulicity was indicated for "weight loss."

123.    Specifically, the OPDO found that Lilly was omitting information that patients were receiving additional medications during the trials which showed weight loss. The OPDO found that the "omission of this information undermines the ability of the viewer to understand and evaluate the efficacy claims presented in the proposed TV Ad."

## FIRST CAUSE OF ACTION
## (NEGLIGENCE – FAILURE TO WARN –
## AGAINST ALL DEFENDANTS)

126.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

127.    Texas law imposes a duty on companies who design, manufacture, test, advertise, promote, market, sell, and distribute prescription medications to adequately warn prescribing physicians of the extent, nature, and severity of the risks of harm posed by their products. At all times mentioned herein, the Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Trulicity that was prescribed to and used by the Plaintiff.

128.    Trulicity was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

129.    At all relevant times, after approval of Trulicity, and at the times Trulicity left the Defendant's control, Defendant knew or should have known that Trulicity was defective and unreasonably dangerous because the labeling for the prescription medications did not adequately warn of the risk of gallbladder injury and its sequelae, especially when used in the form and manner as provided by Defendant.

130.    Despite the fact that Defendant knew or should have known that Trulicity caused unreasonably dangerous injuries, Defendant continued to market, distribute, and/or sell Trulicity to consumers, including Plaintiff, without adequate warnings.

31

131.    Despite the fact that Defendant knew or should have known that Trulicity caused unreasonably dangerous injuries, Defendant continued to market Trulicity to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

132.    Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

133.    At all relevant times, given its increased safety risks, Trulicity was not fit for the ordinary purpose for which it was intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus and/or to reduce cardiovascular risk in patients with type 2 diabetes.

134.    At all relevant times, given its increased safety risks, Trulicity did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff.

135.    Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Trulicity into the stream of commerce, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous injuries, such as gallbladder injury and its sequelae.

136.    At all relevant times, Plaintiff was using Trulicity for the purposes and in a manner normally intended.

137.    The Trulicity designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate warnings or instructions, as the Defendant knew or should have known that the products created a risk of

serious and dangerous injuries, including gallbladder injury and its sequelae, as well as other severe and debilitating personal injuries, and the Defendant failed to adequately warn of said risk.

138.    The Trulicity designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendant knew or should have known of the risks of serious side effects, including gallbladder injury, as well as other severe and debilitating health consequences from Trulicity, they failed to provide adequate warnings to users and/or prescribers of the products, and continued to improperly advertise, market and/or promote their products, Trulicity.

139.    The label for Trulicity was inadequate because it did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Trulicity, including the increased risk of gallbladder injury and its sequelae.

140.    The label for Trulicity was inadequate because it failed to warn Plaintiff's prescribing physician(s) that there was a causal association between these drugs and gallbladder injury and its sequelae, based on post-marketing safety data, safety signals, and medical and scientific literature.

141.    The label for Trulicity was inadequate because it did not warn and/or adequately warn that Trulicity had not been sufficiently and/or adequately tested for safety risks, including gallbladder injury and its sequelae.

142.    The label for Trulicity was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Trulicity.

143.    The label for Trulicity was inadequate because it did not warn and/or adequately warn of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects.

144.    Communications made by Defendant to Plaintiff's prescribing physician(s) and Plaintiff were inadequate because Defendant failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Trulicity, including the increased risk of gallbladder injury and its sequelae.

145.    Communications made by Defendant to Plaintiff's prescribing physician(s) and Plaintiff were inadequate because Defendant did not warn Plaintiff's prescribing physicians of all conditions for which a causal association exists, including, but not limited to, gallbladder injury and its sequelae.

146.    Communications made by Defendant to Plaintiff's prescribing physician(s) and Plaintiff were inadequate because Defendant failed to warn and/or adequately warn that Trulicity had not been sufficiently and/or adequately tested for safety risks, including gallbladder injury.

147.    Plaintiff had no way to determine the truth behind the inadequacies of Defendant's warnings as identified herein, and Plaintiff's reliance upon Defendant's warnings was reasonable.

148.    Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendant's warnings as identified herein, and the physicians' reliance upon Defendant's warnings was reasonable.

149.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gallbladder injury and its sequelae, which are causally associated with Trulicity, they would not have prescribed Trulicity and/or would have altered their prescribing

practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Trulicity so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

150. Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including gallbladder injury and its sequelae, they would not have prescribed Trulicity and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Trulicity so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

151. Had Plaintiff been warned of the increased risk of gallbladder injury and its sequelae causally associated with Trulicity, Plaintiff would not have used Trulicity and/or suffered from gallbladder injury and its sequelae.

152. Had Plaintiff been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including gallbladder injury and its sequelae, Plaintiff would not have used Trulicity and/or suffered gallbladder injury and its sequelae.

153. Had Plaintiff been warned of the increased risk of gallbladder injury and its sequelae, which are causally associated with Trulicity, Plaintiff would have informed Plaintiff's prescribers that Plaintiff did not want to take Trulicity.

154. Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Trulicity due to the risk of gallbladder injury and its sequelae, Plaintiff's prescribing physician(s) would not have prescribed Trulicity and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Trulicity so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

155.    By reason of the foregoing, Defendant have become liable to the Plaintiff for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous product, Trulicity.

156.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective products which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore liable for the injuries and damages sustained by the Plaintiff under Texas law.

157.    Defendant's inadequate warnings for Trulicity were acts that amount to willful, wanton, grossly negligent, and/or reckless conduct by Defendant.

158.    The inadequate warnings in Defendant's drug, Trulicity, existed when Defendant marketed and sold the drugs to Plaintiff's prescribing physician(s) and/or to Plaintiff and when the drug was prescribed to Plaintiff.

159.    When Defendant marketed and sold Trulicity to Plaintiff's prescribing physician(s) and/or to Plaintiff, the product was unreasonably dangerous because they had defective warnings.

160.    The inadequate warnings for Defendant's drug, Trulicity, were a producing cause of, a proximate cause of, and/or a substantial factor in causing Plaintiff's injuries and damages.

161.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous injuries including gallbladder injury and its sequelae, which resulted in other severe and debilitating personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

162.    As a result of the foregoing acts and omissions, the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related

expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

163.    Plaintiff would show that Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the connection between Plaintiff's injuries and Defendant's medications until after January 30, 2023, when Plaintiff learned that Trulicity may cause gallbladder injury and its sequelae.

164.    Pleading further and subject to the foregoing and without waiving same, Plaintiff would show that Defendant owed Plaintiff's prescribing physician(s) and/or Plaintiff a duty to adequately warn of the extent and the nature of the risks posed by their medications. Plaintiff would further show that because Defendant improperly withheld and/or concealed and/or hid information regarding the extent and the nature of the risks posed by their medications from Plaintiff's prescribing physician(s) and/or Plaintiff, Plaintiff was unable to learn about the cause of Plaintiff's injuries until after January 30, 2023, when Plaintiff learned that Trulicity may cause gallbladder injury and its sequelae. Accordingly, Defendant fraudulently concealed the existence of Plaintiff's claims.

**SECOND CAUSE OF ACTION**
**(STRICT PRODUCT LIABILITY FAILURE TO WARN –**
**AGAINST ALL DEFENDANT)**

165.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

166.    Under Texas law, a company that sells a product in a defective condition unreasonably dangerous to the user or consumer is subject to liability for harm caused to the ultimate user or consumer.

167.     Products can be unreasonably dangerous because of a defect in marketing, design, or manufacturing.

168.     Texas law imposes a duty on companies who design, manufacture, test, advertise, promote, market, sell, and distribute prescription medications to adequately warn prescribing physicians of the extent, nature, and severity of the risks of harm posed by their products. At all times mentioned herein, the Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Trulicity that was prescribed to and used by the Plaintiff.

169.     Trulicity was expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

170.     At all relevant times, after approval of Trulicity, and at the times Trulicity left the Defendant's control, Defendant knew or should have known that Trulicity was defective and unreasonably dangerous because the labeling for the prescription medications did not adequately warn of the risk of gallbladder injury and its sequelae, especially when used in the form and manner as provided by Defendant.

171.     Despite the fact that Defendant knew or should have known that Trulicity caused unreasonably dangerous injuries, including, but not limited to, gallbladder injury and its sequelae, Defendant continued to market, distribute, and/or sell Trulicity to consumers, including Plaintiff, without adequate warnings.

172.     Despite the fact that Defendant knew or should have known that Trulicity caused unreasonably dangerous injuries, including, but not limited to, gallbladder injury and its sequelae,

Defendant continued to market Trulicity to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

173. Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

174. At all relevant times, given their increased safety risks, Trulicity was not fit for the ordinary purpose for which it was intended.

175. At all relevant times, given their increased safety risks, Trulicity did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff.

176. Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Trulicity into the stream of commerce, including a duty to assure that the products would not cause users to suffer unreasonable, dangerous injuries, such as gallbladder injury.

177. At all relevant times, Plaintiff was using Trulicity for the purposes and in a manner normally intended.

178. The Trulicity designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate warnings or instructions, as the Defendant knew or should have known that the products created a risk of serious and dangerous injuries, including, but not limited to, gallbladder injury and its sequelae, as well as other severe and debilitating personal injuries, and the Defendant failed to adequately warn of said risk.

179. The Trulicity designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate post-marketing

surveillance and/or warnings because, after Defendant knew or should have known of the risks of serious side effects, including gallbladder injury, as well as other severe and debilitating health consequences from Trulicity, they failed to provide adequate warnings to users and/or prescribers of the products, and continued to improperly advertise, market and/or promote the products.

180.    The label for Trulicity was inadequate because it did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Trulicity, including the increased risk of gallbladder injury and its sequelae.

181.    The label for Trulicity was inadequate because it failed to warn Plaintiff's prescribing physician(s) that there was a causal association between these drugs and gallbladder injury and its sequelae based on post-marketing safety data, safety signals, and medical and scientific literature.

182.    The label for Trulicity was inadequate because it did not warn and/or adequately warn that Trulicity had not been sufficiently and/or adequately tested for safety risks, including gallbladder injury and its sequelae.

183.    The label for Trulicity was inadequate because it did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Trulicity.

184.    The label for Trulicity was inadequate because it did not warn and/or adequately warn of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects.

185.    Communications made by Defendant to Plaintiff's prescribing physician(s) and Plaintiff were inadequate because Defendant failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Trulicity, including the increased risk of gallbladder injury and its sequelae.

186.    Communications made by Defendant to Plaintiff's prescribing physician(s) and Plaintiff were inadequate because Defendant did not warn Plaintiff's prescribing physicians of all conditions for which a causal association exists, including, but not limited to, gallbladder injury and its sequelae.

187.    Communications made by Defendant to Plaintiff's prescribing physician(s) and Plaintiff were inadequate because Defendant failed to warn and/or adequately warn that Trulicity had not been sufficiently and/or adequately tested for safety risks, including gallbladder injury.

188.    Plaintiff had no way to determine the truth behind the inadequacies of Defendant's warnings as identified herein, and Plaintiff's reliance upon Defendant's warnings was reasonable.

189.    Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendant's warnings as identified herein, and his/her/their reliance upon Defendant's warnings was reasonable.

190.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gallbladder injury causally associated with Trulicity, they would not have prescribed Trulicity and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Trulicity so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

191.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including gallbladder injury, they would not have prescribed Trulicity and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Trulicity so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

192.    Had Plaintiff been warned of the increased risk of gallbladder injury causally associated with Trulicity, Plaintiff would not have used Trulicity and and/or suffered from gallbladder injury and its sequelae.

193.    Had Plaintiff been warned that Trulicity had not been sufficiently and/or adequately tested for safety risks, including gallbladder injury, Plaintiff would not have used Trulicity and/or suffered gallbladder injury and its sequelae.

194.    Had Plaintiff been warned of the increased risk of gallbladder injury causally associated with Trulicity, Plaintiff would have informed Plaintiff's prescribers that Plaintiff did not want to take Trulicity.

195.    Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Trulicity due to the risk of gallbladder injury, Plaintiff's prescribing physician(s) would not have prescribed Trulicity and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Trulicity so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

196.    By reason of the foregoing, Defendant has become liable to the Plaintiff for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous products, Trulicity.

197.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective products which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore liable for the injuries and damages sustained by the Plaintiff under Texas law.

198.    Defendant's inadequate warnings for Trulicity were acts that amount to willful, wanton, grossly negligent, and/or reckless conduct by Defendant.

199.    The inadequate warnings for Defendant's drug, Trulicity, existed when Defendant marketed and sold the drugs to Plaintiff's prescribing physician(s) and/or to Plaintiff and when the drug was prescribed to Plaintiff.

200.    When Defendant marketed and sold Trulicity to Plaintiff's prescribing physician(s) and/or to Plaintiff, the product was unreasonably dangerous because they had defective warnings.

201.    The inadequate warnings in Defendant's drug, Trulicity, were a producing cause of, a proximate cause of, and/or a substantial factor in causing Plaintiff's injuries.

202.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous injuries including gallbladder injury and its sequelae, which resulted in other severe and debilitating personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

203.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

204.    Plaintiff would show that Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the connection between Plaintiff's injuries and Defendant's medications until after January 30, 2023, when Plaintiff learned that Trulicity may cause gallbladder injury and its sequelae.

205.    Pleading further and subject to the foregoing and without waiving same, Plaintiff would show that Defendant owed Plaintiff's prescribing physician(s) and/or Plaintiff a duty to

43

adequately warn of the extent and the nature of the risks posed by their medications. Plaintiff would further show that because Defendant improperly withheld and/or concealed and/or hid information regarding the extent and the nature of the risks posed by their medications from Plaintiff's prescribing physician(s) and/or Plaintiff, Plaintiff was unable to learn about the cause of Plaintiff's injuries until after January 30, 2023, when Plaintiff learned that Trulicity may cause gallbladder injury and its sequelae. Accordingly, Defendant fraudulently concealed the existence of Plaintiff's claims.

### THIRD CAUSE OF ACTION
### (BREACH OF EXPRESS WARRANTY – AGAINST ALL DEFENDANT)

206.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

207.    At all relevant times, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendant who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Trulicity as hereinabove described that was used by Plaintiff.

208.    At all relevant times, Defendant expressly warranted to Plaintiff's prescribing physician(s) and Plaintiff that Trulicity was safe and effective. Specifically, Defendant expressly warranted to Plaintiff's prescribing physician(s) and to Plaintiff that Trulicity could be safely taken to help treat type 2 diabetes, to reduce cardiovascular risk, and/or for weight loss and did not carry with them an increased risk of gastrointestinal complications, including, but not limited to, gallbladder injury. Defendant also expressly warranted to Plaintiff's prescribing physician(s) and to Plaintiff that Trulicity would safely limit how much sugar gets into blood from the liver, that Trulicity would safely and effectively slow down how quickly food leaves the stomach, and that

44

Trulicity would safely and effectively help the pancreas release insulin in response to high blood sugar levels. Defendant also expressly warranted to Plaintiff's prescribing physician(s) and to Plaintiff that Trulicity would safely and effectively lower A1C, reduce cardiovascular risk in patients with type 2 diabetes, and control weight.

209.    All of the aforementioned express warranties were made to Plaintiff's prescribing physician(s) and to Plaintiff by way of Trulicity's labels, websites, advertisements, promotional materials, and through other statements.

210.    As a result of Defendant's express warranties to Plaintiff's prescribing physician(s) and to Plaintiff, Plaintiff's prescribing physicians were induced to, and did, prescribe Trulicity to Plaintiff, and Plaintiff was induced to, and did, use Trulicity.

211.    At all relevant times, Defendant reasonably anticipated and expected that individuals, such as the Plaintiff, would use and/or consume Trulicity based upon their express warranties.

212.    At all relevant times, Defendant reasonably anticipated and expected that prescribing physicians, such as the Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Trulicity based upon their express warranties.

213.    At all relevant times, Defendant knew or should have known that Trulicity was unreasonably dangerous because of the increased risk of gallbladder injury, especially when the drug was used in the form and manner as provided by Defendant.

214.    At all relevant times, Defendant knew or should have known that Trulicity had not been sufficiently and/or adequately tested for safety.

215.    The unreasonably dangerous characteristics of Trulicity were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

216.    The unreasonably dangerous characteristics of Trulicity were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

217.    At the time Trulicity left the Defendant's control, Trulicity did not conform to Defendant's express warranties because Trulicity was not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus, to reduce cardiovascular risk in patients with type 2 diabetes, or to control weight, in that it was causally associated with an increased risk of gallbladder injury.

218.    The express warranties made by Defendant regarding the safety of Trulicity were made with the intent to induce Plaintiff to use the products and/or Plaintiff's prescribing physician(s) to prescribe the products.

219.    Defendant knew and/or should have known that by making the express warranties to Plaintiff and/or Plaintiff's prescribing physician(s) it would be the natural tendency of Plaintiff to use Trulicity and/or the natural tendency of Plaintiff's prescribing physician(s) to prescribe Trulicity.

220.    Plaintiff and Plaintiff's prescribing physician(s), as well as members of the medical community, relied on the express warranties of the Defendant identified herein.

221.    Had Defendant not made these express warranties, Plaintiff would not have used Trulicity and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Trulicity and/or would have altered their prescribing practices and/or would have

provided Plaintiff with adequate warnings regarding the dangers of Trulicity so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Trulicity.

222.    Plaintiff's injuries and damages were directly and/or proximately caused by Defendant's breach of the aforementioned express warranties.

223.    Plaintiff's injuries and damages arose from a reasonably anticipated use of the products by Plaintiff.

224.    Accordingly, Defendant is liable as a result of their breach of express warranties to Plaintiff.

225.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including gallbladder injury and its sequelae, which resulted in other severe and debilitating personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

226.    By reason of the foregoing, Plaintiff has been severely injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendant's Trulicity.

227.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

228.    Plaintiff would show that Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the connection between Plaintiff's injuries and Defendant's medications until after January 30, 2023, when Plaintiff learned that Trulicity may cause gallbladder injury and its sequelae.

229.    Pleading further and subject to the foregoing and without waiving same, Plaintiff would show that Defendant owed Plaintiff's prescribing physician(s) and/or Plaintiff a duty to adequately warn of the extent and the nature of the risks posed by their medications. Plaintiff would further show that because Defendant improperly withheld and/or concealed and/or hid information regarding the extent and the nature of the risks posed by their medications from Plaintiff's prescribing physician(s) and/or Plaintiff, Plaintiff was unable to learn about the cause of Plaintiff's injuries until after January 30, 2023, when Plaintiff learned that Trulicity may cause gallbladder injury and its sequelae. Accordingly, Defendant fraudulently concealed the existence of Plaintiff's claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and debilitating personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.    Awarding Plaintiff the costs of these proceedings; and

4.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: July 31, 2025                                RESPECTFULLY SUBMITTED,

*/s/ Jonathan M. Sedgh*
Jonathan M. Sedgh
Morgan & Morgan
199 Water Street, Suite 1500
New York, NY 10038
Phone: (212) 738-6839
*jsedgh@forthepeople.com*

Nicole Lovett
Morgan & Morgan
201 N Franklin St, 7th Floor
Tampa, FL 33602
Phone: **(813) 275-5263**
Fax: (813) 222-2455
*nlovett@forthepeople.com*

*Attorneys for Plaintiff*